I need you. Sorry for the background noise. Ok! Ok. Do you want to rest? What's wrong? Ok. Do you want to hear more or not? Yeah.  Good morning, Governor. Good morning. Good morning. May it please the court, I'm James Price here on behalf of the appellant Reliant LLC. Your honors, this appeal arises from a breach of contract that Reliant made and filed in the Armed Services Board of Contract Appeals that arose out of a contract whereby Reliant was delivering relocatable buildings to two bases in Afghanistan for U.S. troops. Do you argue that the delivery orders and the amendments were not integrated contracts? Yes, your honor. Show me in the record where you made that argument to the board. In the record when we made the argument to the board? Yes. Your honor, I do not specifically recall exactly how we presented that argument in the lower court in response to the motion for summary judgment. But I do believe that we pointed out that the IDIQ contract was the controlling document and therefore the delivery orders or task orders couldn't therefore be fully integrated and separate contracts. They were issued out of the IDIQ contract. The IDIQ contract was a contract, as its acronym indicates, was a contract to provide. It was not an integrated argument. You're sort of subsumed in your argument that the IDIQ prevails. Yes, your honor. At all times and all instances. Any other thing that purports to be a contract is a joke, waste of time, and not worth the paper it's written on. It's certainly not a joke, your honor. I mean it's a joke because it was a waste of everyone's time. It wasn't a waste of time. You're talking about wasting the government's time, wasting your client's time. It certainly would have been better practice if they were attempting to modify a term of the IDIQ contract to modify, as they did in a couple of instances. The IDIQ clause that you rely on, H1, in the schedule, says that various awards will be made when the contracting officer puts out a notice of intent to make a purchase. There's a notice. And I didn't see anything in our record of one of those notices. Were any such notices of record at the trial below? No, your honor, they were not. And that's one of the challenging things in this instance. Because of the environment, it was a very challenging environment in Afghanistan. There were a lot of records that neither party was able to provide. It might have been helpful to know what was in the notice of intent, especially with regard to whether the IDIQ would be some more pricing conversations. Certainly, your honor, if that document reflected that there could be some other pricing. Well, it's not a record and you say it wasn't involved in the case below. Also, apparently, we don't know anything about the two other parties that were also hoping to engage in this commerce with the government. We do know as the... But I have a record. I mean, I didn't see anything in the record about whether they were being asked as a result of notices of intent sent to them and whether they were, as a course of conduct, making submissions and getting into the kind of discussions and debates that your client got into with the contracting officer. So that's all off the table as well, right? There are no... Again, no documents that we have from the contracts with the other contractors who were ultimately awarded delivery orders under the same... We don't know whether any of them even got a delivery order, right? Yes, we do. In fact, if you look... Does it have a record? That's something that the government acknowledges, Your Honor, on page... You're referring to the appendix or a brief? In its brief on page 3, the government acknowledges that at least two other entities, EODT and PPI, did in fact receive awards of delivery orders and that was also noted in the board's opinion on page 2. Okay. But again, the facts and circumstances, because part of what the government is sort of taxing you with is the course of dealing. The course of dealing here... I didn't mean it pejoratively, but why would your client have engaged in these different pricing negotiations and the delivery orders and then, you know, to be something that was permissible? Your Honor, if the parties, I think, knew what would ultimately happen, if they conducted themselves the way they did, they would have thought differently about how they conducted themselves. What we're left with... The course of conduct is of interest to me and then the government cites Nash and Savinic, which are, as you know, Ralph and the other guy who have been around for a long time, and they have a whole section in their treatise that talks about this and says, pricing changes in delivery orders is quite common under IDIQ contracts. And I didn't see you coming back and countering that statement as a practice by saying, yes, that's so, but they were all in different circumstances than these. And to speak to that briefly, you're right. We didn't, but that's a treatise rather than any case law that we had to rely upon, and we frankly aren't aware of any cases that have disposed of that issue. Was your offer, your client's offer of a 5% discount a deviation from the IDIQ? It certainly would have been a deviation from the IDIQ contract. So it was then contemplated that there would be deviations from the IDIQ, right? Well, certainly, Your Honor, they offered it. Whether they contemplated that that was something that they had the right to do, they did it. In hindsight, should they have done it differently? Certainly, that should have been something that they made as an amendment to the IDIQ contract rather than something that got haphazardly incorporated into a delivery order. Offered and accepted, yes. What was offered and what ultimately was accepted I think is a material fact in dispute. I think it's clear from the email that Mr. Biles sent that the offer was contingent upon two contingencies, Your Honor. One that they would be, because they would be allowed to... You're arguing economies of scale. That's one of the arguments, one of the contingencies, but the second is that all of the delivery orders were to be awarded to Reliant. Others were offering discounts as well, were they not? We don't know with certainty whether that was true or not, Your Honor. What we know is that Reliant was not awarded all of the DOs. As I said, the government has acknowledged that there were others who were awarded DOs, so the second contingency was not met either, and therefore the discount should not have been applied. The basic contract looks like it was modified seven times because we have POO1 and POO7 that we know about in the record. Is 2, 3, 4, 5, and 6 immaterial for purposes of this appeal? For purposes of the appeal, they are immaterial, Your Honor. And in 7, you agreed to a whole lot of unit price changes, which I think you would agree are appropriate because that's changes in the IDIQ. Exactly. So it looked to me like most of your monetary claim is stacked up on delivery order one. Is that right? The dollar value certainly is on— On the others, it's got to be the 5%. That's correct, Your Honor. That's all you're talking about because you agreed to those other prices, whether they're higher, lower, or whatever. Yes, we're not arguing about the pricing. So the game is essentially on your legal argument based on delivery order one with regard to DL1 and then the 5%. That was applied to delivery orders too. If we disagree with you on the 5%, the harm done to you from your view on the other delivery orders goes away. That's correct. So I think it's— So these were the things manufactured in Turkey? And that was the original idea, wasn't it? That was the original idea, Your Honor. The difficulty became is that after manufacturing had been going on for almost a year, there was a conflict in the approvals that my client had. They received approval for first article testing, which is something we tried for three days back in February on the consolidated claims that are not part of this appeal. The first article testing granted our client's approval for the units they produced. Sorry. They produced that had laminate boards, but then a captain at one of the locations said that wasn't good enough despite the first article testing, which put them in a real conundrum. And so they decided that we can't get around the captain to get this done, so we're going to have to start manufacturing units with drywall, and we can only do that if we move to Afghanistan, which is one of the reasons that they weren't able to gain the efficiencies that they intended to gain. They would have had to ship a constructed—were these things broken down in modules or something, and they're going to ship a constructed unit from Turkey to Afghanistan? Yes. In the form of a connex. Yes. So you have shipping containers, and you think of one shipping container, but a building in this instance was about 100 shipping containers, a pretty sizable structure. And so to have to move those from Turkey to Afghanistan alone was an arduous and expensive task, but then also to find the materials within Afghanistan to be able to outfit those units once they were delivered, and the manpower with the skill to do it was also very challenging. So as Judge Prouty said at the end of the trial in the other matter, the other appeal, he understood why my client was upset with the way the government has treated my client. You're into your rebuttal time. Thank you. Thank you, counsel. Mr. Chiavatti? Did I say it right? I'm sorry. I didn't hear how you said it, Your Honor. Well, tell us your name. Anthony Chiavetti on behalf of the family, Your Honor. Okay. May it please the Court, the ASBCA correctly concluded that the IDIQ contract and delivery orders at issue in this case were not ambiguous, that the government's interpretation of those documents is correct, and that Reliant's interpretation is not reasonable. The Army's interpretation is consistent with and harmonizes all of the terms of both the umbrella IDIQ contract as well as the delivery orders that were placed thereon, which reflect the party's intent and understanding of the contract because of the price that deviates from the IDIQ contract. Well, you also have a course of conduct as well as a course of negotiations. It is indeed, Your Honor. But in this case, and as you've seen in the briefing, my opponent argues that that course of conduct should not be considered because it's parole evidence. But, in fact, in this case, it's not through parole evidence. It's part of the contract. It's the delivery orders themselves that display that course of conduct and display that the parties mutually understood the contract through Section H1 to set up a paradigm where delivery order pricing was going to be negotiated among the three holders of this multiple award IDIQ contract and price competition would be maintained as the FAR requires and as the contracting system sets up a preference for it. Pricing competition would be maintained at the delivery order level as well as in the initial award of umbrella contracts. Just out of curiosity, was the change from particle board to drywall because of the result of potential impact on the exterior of the content? I don't think the answer to that is reflected in the record, and I don't know it, Your Honor. But the changes that were made, as was seen through the documents in this case and the course of conduct that that reflects, shows that when changes were made to the statement of work, the ceiling pricing in the umbrella IDIQ contract was lifted as a result. But two effects there that are relevant to this case is, one, it didn't retroactively then change pricing necessarily for the delivery orders. That had to be negotiated and was in many cases negotiated. And, in fact, was accepted in modifications to delivery orders 2, 3, and 4 and delivery order 1. But speaking of 2, 3, and 4, were each modified at least once with no reservation of rights and in a way that maintained a deviation of price from the delivery order pricing to the IDIQ umbrella contract pricing but removed all reference to a 5% discount, much less any reference to a contingency for manufacturing efficiency, which didn't appear even in the original delivery orders. So any argument that, even if there were an argument that delivery order pricing in the initial delivery orders was contingent because of language that was in the email conveying those bids, any such contingency was clearly overtaken and waived by a mutual agreement to delivery order modifications, which continued to maintain pricing that was lower than the IDIQ umbrella contract and made no reference to any contingency. Was the government ever, as a result of cases and arguments in courts like this, the lawyers ever go back to the agency and say, hey, you know, we had a great big case and expended a lot of resources arguing over a question that could be very easily solved by putting a couple of words in contracts? Do you ever do that? Do you ever go back and make a suggestion to this government that serves us all that the government could improve itself? It certainly should. Don't you think it would be easy to say here, you know, all you have to do on this IDIQ contract in H1 is to make clear that the prices that are in the original IDIQ aren't locked in? Right. It's certainly the case, Your Honor, that the – Because National Civics doesn't have a case to cite, right? That's correct, Your Honor. They got Ralph and his friend carrying on. They were the gurus. They knew more about government contracts than anybody else, and so they would write something down. But they aren't authority. Right. Absent a case. So how do I know it's true that in these contract cases that the IDIQ price doesn't go up? Well, the only way to – You know what I'm talking about. I'm talking about your brief. You cite me, National Civics. You don't bother to give me the text. You make me have to go look it up in the library. You really ought to put it in the text in the brief so I don't have to do that. And I read the text, and I read what it said, but I don't have any cases. Indeed, Your Honor. And, in fact, understood because I had to go to the library as well because they're not available online. But as you recognize, this is the leading treatise in the area. But not only that, Your Honor. But look at the contract, H1. Look at it. It says here, oh, the contracting officer will fairly consider the offers received. Okay. We'll consider price and any other factors listed in the notice. Well, that suggests that price wasn't listed in the notice or was price listed in the notice. The price would be offered by the offeror who's bidding on the delivery order. So the notice would go out and acknowledge that the notices in this case are not on the record, but the notice would go out asking for the offerors to provide a price as well as to detail other technical factors. You would expect the offeror to offer the price that was stated in the IDIQ, right? Could or lower. In fact. Or higher. Not under the interpretation that the government offers here. Why is that interpretation any good at all? You're saying, well, it was a ceiling. Why wasn't it a floor? Well, it couldn't be a floor because that would render impermissible and irrelevant the conduct of the parties in negotiating lower prices. So in harmonizing all of the documents that make up this contract. This is an after the fact interpretation of the contract. Your interpretation of the contract doesn't depend on the conduct of the parties here. That's no fair. You have to construe the contract looking at the words of it. And you're saying, look at the words. Well, it means that it's a ceiling. I'm not saying that's nonsense. It could equally have been a floor. Because you ignore the course of conduct for purposes of interpreting the words of the contract. Understood, Your Honor. Two points. First, the course of conduct here is demonstrated through parts of the contract because the delivery orders once issued become part of the contract. So that language then is part of the contract that this court construes altogether. I understand what you're saying. It has to reconcile itself. Okay, so you're saying, but you're also using the numbers that are in the delivery orders. Yes, Your Honor. Which is the real line. I can understand the fact of the delivery orders playing into your interpretation of the contract, but not the numbers themselves. Moreover, Your Honor, I'd like to point out that this court needn't accept that those prices in the IDIQ price list represent ceiling prices to affirm the ASPCA. Rather, all that the court must agree is that the delivery order pricing controls and may, in fact, deviate from the IDIQ. Well, I know, but we have to resolve your adversary has brought forth the conflict. And the conflict is whether or not H1 trumps everything that comes afterwards. And it sounds a little preposterous in the setting of this case, but it's a pure question of law, like in Contract 101. And all I'm saying is I'm suspicious of your interpretation of the contract, saying that it all works okay because it has to be a ceiling. Right. Well, to see why a ceiling makes the most sense may be peripheral to your question, but the parties modified the pricing structure in the IDIQ umbrella contract several times, at least twice, with Modification 1 and Modification 7. That action would have no meaning if we were just talking about baseline prices, for example, if it's more of a pricing suggestion in the delivery order. It's just rewriting the IDIQ. The fact that you change an IDIQ price doesn't tell you anything other than the fact that they just rewrote the basic contract. Right. And it's an umbrella contract that Section H1… Well, you have an argument about the inherently indefinite nature of this offer to multiple contractors as to building in competition to lower the price as opposed to raise the price. Exactly right, Your Honor. And so that whole paradigm set up… You haven't made it. Well, I think that the argument that we've made about Section H1 and its effect maintaining price competition, as well as the argument that we've made in terms of examining the language of the contract… You made it in your briefs. Yes. You haven't made it yet. Understood. In context with… You examine the intent of the parties and the terms of the contract in context with the general practice in that area. And so when doing so, National Sabinic laid out, but also the FAR itself. FAR 16.505 states that the contracting officer will consider price when awarding delivery orders under a multiple award IDIQ contract structure. FAR 16.504 sets out the preference for multiple award IDIQ contracting for exactly this reason, to maintain price competition over the length of the duration of the IDIQ contract. And so that whole… Where is it in 505 that it says you can consider price? Your Honor, it's 16.504, excuse me, C1, little 1. So I misspoke there. 16.504 is that part. Oh, I'm sorry. 16.504 states, quote, the contracting officer must, to the maximum extent practicable, give preference to making multiple awards of indefinite quantity contracts under the single solicitation. But it's 505BE1iE that does the trick for you, isn't it? Yes, exactly. It says the contracting officer, the word is must, under each order, one of the factors. That's correct, Your Honor, and that language is reflected. Consider price or cost under each order as one of the factors in the selection decision. That's exactly right, Your Honor, and that language is reflected in Section H1 of this contract, which states a similar order. Well, there's a place in H1 where you can slide the regulation in if you want to. The language in H1 isn't as clear as you'd like it, right? Well, it does state, Your Honor, I'm quoting from… Will consider price and any other factors listed in the note. That's correct, Your Honor, and so other factors… If that was perfectly accurate, it would say they must because the regulation doesn't say may. The regulation, 16.505B1iE, says the contracting officer must consider. Correct, Your Honor, and the contract also doesn't use the word may. It uses the word will, which submit is the same as must, and it's mandatory in the same way that must is. Well, no, the must says they have to, and then the will says that they're going to follow the requirement that they must. Precisely, Your Honor. They're two different words.  I acknowledge that, Your Honor. In either way, the FAR provisions are still mandatory from a regulatory standpoint on the contracting officer in effectuating the terms of the contract here. And so reading the contract in the context of all of its documents… Of course, you can have a situation where under the regulation you must consider price and cost, but if the IDIQ contract itself always trumped, you would consider it. So if you're referring… The language in the regulation doesn't necessarily win the case for you because if the law said that the price in the IDIQ is what it is and you can't change it, then the contracting officer must consider that. If it did say that, Your Honor, I would agree. Of course, the contract does not state that, and in fact, along similar lines, the appellant's argument that the ordering clause, which the portion of the ordering clause that they quote is really a supremacy clause, stating that the terms of the IDIQ umbrella contract control over the delivery orders, of course, only comes into play if there's a conflict between them. And under the government's interpretation or even the alternate interpretations that Your Honor has suggested, there is no conflict. There's only a conflict if the pricing in the umbrella contract… …always trumps and never can change it. Exactly correct, Your Honor. So their premise in that argument is required to abide by… If they're right about that premise, then there is a conflict. Well, but there would also be a conflict under that interpretation, as we pointed out in our briefs, which would render all of the actions in negotiating delivery order prices and agreeing to delivery order prices that were less than the price list and agreeing to modifications of those delivery orders, which continue to have prices that were less than the price. All of that behavior… Could have been false hope. It would essentially be meaningless. It would be arguably prohibited by the contract. And so all of this course of conduct as reflected in contract documents that then became part of the contract would be rendered meaningless by this interpretation. And that's why the board correctly found that interpretation to be unreasonable in light of the contract read as a whole. The only explanation for the conduct would be something in the nature of a gotcha that they engaged in this conversation in order to get the contract, in order to award them the prize, and then you come in later and say, but you didn't pay me enough. That makes perfect sense. We haven't certainly alleged bad faith in this case, nor was it before the board. I don't think there's any basis for bad faith here, my goodness. Subject to any further questions, for these reasons and those stated in our brief, the United States respectfully requests that this court affirm the decision of the ASPCA. Thank you. Thank you, counsel. I'll just make a comment about the English language. You can sit down. And that is, when I was at Cambridge, I asked one of the officers of my college, could you do something for me? And he said, you mean, would I? And I said, is there a difference? And he said, you use could to a servant, because if they can, they will. Your Honor, as you stated, the ordering clause in the IDIQ contract states that all delivery orders or task orders are subject to the terms and conditions of this contract. The IDIQ contract set fixed prices for each type of relocatable building to be constructed as there were different sizes for those buildings. If we were to take the government's argument to be valid, why did the government agree to amend delivery orders 2 through 4 to reflect the fixed prices that were set forth in the IDIQ contract, less, of course, the 5% discount? Why would they have done that if they were negotiating prices on each of the delivery orders? That's speculative. It's convenient for the government to make that argument now in hindsight, but I think the actions of the parties illustrate that both parties had a different interpretation of the contract at the time these delivery orders were issued. Further, a plain reading of the contract supports Reliance interpretation. The IDIQ contract terms, including pricing, prevail over conflicting pricing terms in the delivery orders. The ordering clause does not contain any exception or qualifications related to pricing. The court below referred to the IDIQ prices as a ceiling, but there's no basis in law for that. If the difference of view between yourself and the government is so clear, then why isn't the ambiguity patent? Your Honor, I think that when you look at these things in hindsight, the ambiguity that was not so clear becomes much more clear. Well, that's what I was asking, because it sort of morphed from a latent ambiguity kind of argument to the way the issue is being presented today was you knew from the get-go that the IDIQ contract prevailed, and the only way it could be changed is by amending the IDIQ. The government has the opposite view, which is the contract was negotiable at all times. And I think that's one of the issues you often face in these situations. The lawyers recognize those things as we look at these things in hindsight, but the people on the ground... I mean, no complaint was raised at delivery order one when the numbers started shifting. There were a lot of issues surrounding that because the government had a budget constraint that required that the prices be changed in order to fit within the budget. So it was a significant discussion. But your side could have said, whoa, we don't play. The only number we play with is what's in the IDIQ. If you've got a budgetary problem, find another contractor. They certainly could have, and they would have sustained a significant loss because of all of the work that they had done to get to that point. Wrap up, Counselor. Your Honors, the board granted summary judgment on the issue of the discount to the government because the expression of the contingency in reliance written correspondence when it was offered was not ultimately incorporated in the delivery order itself. We believe this rationale fails because it improperly assumes that the delivery orders were fully integrated contracts. There's no statement in the delivery orders that... This is your last sentence. ...that contain an integration clause and other internal evidence of an integrated character. Thank you. Thank you, Counselor. The matter will stand submitted.